IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| v. | NO. 24-62 |
| **TEVIN MURPHY-ROBINSON** | |

**HODGE, J.**  April 4, 2025

## MEMORANDUM

Before the Court is Defendant Tevin Murphy-Robinson's Motion to Suppress Physical Evidence and Statements (ECF No. 17.) Murphy-Robinson is charged with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The Court held a suppression hearing on January 21, 2025, after which the Court granted the parties' request for leave to file supplemental briefs (ECF Nos. 32, 35).

The Court does not believe that the officers possessed the requisite reasonable articulable suspicion to seize Murphy-Robinson. However, the Court concludes that it was inevitable that the officers would learn Murphy-Robinson's name and, as a result, that he had multiple warrants for absconding, which provided a lawful basis for the Defendant's arrest. Thus, a lawful search incident to arrest would lead to the officers inevitably finding the firearm on Murphy-Robinson. However, because Murphy-Robinson's on-scene statements are not covered by the inevitable discovery doctrine, the Motion to Suppress is granted in part and denied in part.

1

I.      **Factual Background**

On December 10, 2023, a non-fatal shooting occurred in the 2nd Police District of Philadelphia, PA. (ECF No. 17 at 4.)[1] Detectives initiated an investigation and recovered video footage of a silver Buick sedan involved in the shooting. (ECF No. 17 at 4-5; ECF No. 21 at 1-2.) The investigation yielded no information about any individual involved in the shooting. (ECF No. 17 at 4.) On December 13, 2023, the Philadelphia Police Department ("PPD") Shooting Investigation Team ("SIG") issued a patrol alert to the entire police department containing information about the Buick. (*Id.* at 4-5.) The patrol alert contained two photos of the Buick and a written description of the Buick that stated:

> VEHICLE: Older model Buick sedan, silver in color, tinted side windows, empty front license plate holder, vent accents to front quarter panels, heavy damage to driver's side rear door, and a sticker in the lower right corner of the rear windshield. Vehicle may have a paper tag.

(ECF No. 17-1 at 2.) The patrol alert also included various directives, including the following written in red bolded font: "CONTACT SIG PRIOR TO SERVICE AT ANY LOCATION" and "USE CAUTION – SUBJECT TO BE CONSIDERED ARMED & DANGEROUS." (*Id.*)

On December 13, 2023 at 10:56 p.m., while driving southbound on Ogontz Avenue in Philadelphia, two Philadelphia Police Officers, Officer Shawn Bossert and Officer Shawn Wills, spotted a vehicle they believed matched the Buick described in the patrol alert.[2] (ECF No. 21 at 2; ECF No. 17 at 5.) The vehicle was parked in the center median of the road with its hazard lights flashing. (*Id.*) The only business that appeared open in the area was Ed's Pizza House. (ECF No. 29 at 52:11-13.) Officer Bossert pulled up the patrol alert on his phone to compare the Buick described in the alert to the vehicle the officers observed, and both officers believed it was the

---

[1]     The Court adopts the pagination supplied by the CM/ECF docketing system.
[2]     The parties have stipulated to the fact that the vehicle Officers Bossert and Wills observed parked on Ogontz Avenue was the same vehicle as that involved in the December 10, 2023 shooting. (ECF No. 32 at 2, n.1.)

same vehicle. (ECF No. 17 at 5; ECF No. 21 at 2-3.) Officer Wills parked his unmarked police vehicle about a block away to surveil the Buick. (ECF No. 17 at 5; ECF No. 21 at 3.) After approximately five minutes, the officers saw the Defendant exit the pizza shop and approach the Buick with a pizza box in one hand and a soda and napkins in the other. (ECF No. 17 at 5; ECF No. 21 at 3.) Murphy-Robinson then opened the door to the Buick. (ECF No. 29 at 63:17-18.)

Officer Wills was operating the unmarked patrol car, and immediately pulled the vehicle in front of the Buick. (ECF No. 17 at 5.) Officer Wills positioned the car so that it was blocking the Buick, and had his lights and sirens activated "to avoid the [Buick] taking off or fleeing from us." (ECF No. 17 at 5; ECF No. 29 at 24-25.)

Officer Bossert, the passenger in the police vehicle, exited the patrol car first. (ECF No. 29 at 62.) The driver's side door of the Buick was open and Defendant was standing in the driver side doorway as Officer Bossert approached the Defendant and called for him to stop.[3] (ECF No. 29 at 63.) In response to being told to stop, the Defendant turned around and faced Officer Bossert. (ECF No. 29 at 86:25-87:1.) Officer Bossert immediately grabbed Murphy-Robinson by the arms, pushing him back towards the Buick. (ECF No. 17 at 6; ECF No. 29 at 87:9-18.) It is undisputed that the Defendant was then seated in the Buick with his legs outside the vehicle.[4]

After Officer Bossert made contact with the Defendant, Officer Wills waited fewer than twenty seconds before exiting his vehicle. (ECF No. 29 at 26:21-23.) Officer Wills testified that

---

[3] Although the officers were wearing body worn cameras, the sound was not activated on Officer Bossert's camera until 59 seconds into the footage. (ECF No. 17 at 6.) There is no command by the officers captured on the cameras upon immediately exiting their vehicle.) Officer Bossert testified that he does not recall what he said when he approached the Defendant, but it was "something to the effect of 'stop.'" (ECF No. 29 at 64:11-13.)

[4] The government asserts that the Defendant then "actively pulled away from the officers and got into the Buick," (ECF No. 21 at 3). while the defense characterizes the action as an involuntary one—when Officer Bossert grabbed the Defendant it caused him to fall backwards, landing seated in the driver's seat of the Buick with his legs outside the vehicle. (ECF No. 17 at 6.) Having observed the officers' body worn camera footage, the Court agrees with Defendant's characterization of this event—the Defendant appears to have been involuntarily pushed into the vehicle, rather than intentionally trying to get into the vehicle.

he saw the Defendant get into the Buick, after which Officer Bossert "was able to get him out of the car." (*Id.* at 27:14-15.) The officers began giving the Defendant commands to get on the ground, during which time Officer Wills took out his taser. (ECF No. 29 at 27:17-23.) According to the officers, the Defendant refused to get on the ground. (ECF No. 29 at 27:18, 23.) While he was in the car, Murphy-Robinson stated, "I am not doing anything, sir." (ECF No. 17 at 6.) He continued to ask the officers what was going on. (*Id.*)

The government alleges that a struggle ensued, during which the Defendant resisted the officers and was continuously reaching into his jacket pocket. (ECF No. 21 at 3; ECF No. 29 at 92:19-25.) Officer Bossert testified that at one point, he had his taser out and the Defendant grabbed the taser out of his hand. (ECF No. 29 at 27:22-24.) During the struggle, the officers radioed for backup. (ECF No. 21 at 4.) It took several minutes for backup to arrive due to Officers Bossert and Wills' radio settings, but ultimately additional officers arrived on the scene. (ECF No. 28 at 40-41.) Upon their arrival, one officer—Officer MacConnell—deployed his taser on the Defendant while he was on the ground. (ECF No. 17 at 6; ECF No. 21 at 4.) Another officer then announced that there was a gun in the Defendant's jacket. (ECF No. 17 at 7.) The Defendant stated, "it's not mine." (ECF No. 21 at 4.) After further struggle, the Defendant was handcuffed and a Glock 17, 9mm with an obliterated serial number was recovered from his jacket pocket. (ECF No. 17 at 7; ECF No. 21 at 4.) The police also recovered an extended magazine with 22 live rounds, which allegedly fell out of the Defendant's pocket during the struggle. (ECF No. 21 at 4; ECF No. 29 at 77:25-78:2.)

After being handcuffed, the Defendant was subjected to a more extensive search. (ECF No. 21 at 4.) In addition to the Glock, officers also recovered multiple identification cards. (*Id.*) The Defendant was placed in a police vehicle and asked his name. (*Id.*) The Defendant responded:

4

"Tevin Murphy-Robinson, I have a warrant for absconding." (*Id.*) The police ran Defendant's name and confirmed two warrants—one for absconding and an active body warrant for robbery. (*Id.*) The Defendant was arrested on the two warrants and charged locally with possession of a firearm by a person not to possess, related weapons offenses, and assaulting a law enforcement officer. (*Id.* at 4-5.) Murphy-Robinson was then taken to Einstein Medical Center for medical treatment. (ECF No. 17 at 7.)

The following day, December 14, 2023, PPD Detectives Latchum and Goshert escorted the Defendant to an interrogation room at a police station. (ECF No. 17 at 6; ECF No. 21 at 5.) The interview was recorded. (ECF No. 21 at 5.) One detective stated, "Before we start talking to you, I'm just gonna read you your rights, all right," and then recited verbatim *Miranda* warnings to the Defendant. (*Id.*) The detective then asked if the Defendant understood his rights, and the Defendant nodded in the affirmative. (ECF No. 17 at 7; ECF No. 21 at 5.) The Defendant was then asked a series of background and biographical questions, and the Defendant provided his name, date of birth, address, and answered questions about his family and employment, among other things. (ECF No. 21 at 5.) The detective then asked, "What happened," and the Defendant answered and admitted to possessing a firearm, but denied any knowledge or involvement in the December 10, 2023 shooting. (*Id.*; ECF No. 17 at 7.)

## II.     LEGAL STANDARD

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. Amend. IV. Evidence discovered during an unreasonable search or seizure is considered "fruit of the poisonous tree," and is inadmissible at trial. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). With certain exceptions, warrantless arrests are generally considered unlawful.

A defendant may move to suppress evidence pursuant to Rule 41(h) of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 41(h). Once a defendant has established a basis for his motion to suppress, the burden is on the government to show that the search or seizure was reasonable. *See U.S. v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

### III. DISCUSSION

The Fourth Amendment becomes relevant at the moment a defendant is seized. *See United States v. Brown,* 448 F.3d 239, 245 (3d Cir. 2006) (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)); *see also United States v. Amos,* 88 F. 4th 446, 451 (3d Cir. 2023) ("Reasonable suspicion is evaluated at the moment of seizure, so the first step in a suppression analysis is to determine when the seizure occurred."). In this case, the government concedes that a seizure occurred when Officer Bossert placed his hand on Murphy-Robinson's arm while he was standing outside the open driver side door of the Buick. (ECF No. 35 at 3.) Thus, the question for this Court is whether the officers had a reasonable articulable suspicion to stop, or probable cause to arrest, the Defendant.

**A. The Officers Lacked the Requisite Reasonable Suspicion to Seize Murphy-Robinson**

In order to effectuate a lawful detention of an individual, a police officer must have either probable cause to arrest or reasonable suspicion to stop based on specific, articulable facts, "and the inferences that experienced police officers could draw from those facts that a crime has been committed." *United States v. Fowler*, No. 95308, 1995 WL 428693, at *2 (E.D. Pa. July 18, 2008) (citations omitted). As the language in *Fowler* makes clear, these facts "must raise a suspicion that the *particular individual* being stopped is engaged in wrongdoing." *Id.* (emphasis added).

Defendant argues that Officers Bossert and Wills lacked the requisite reasonable suspicion to seize him because their suspicion was predicated on the presence of the Buick, which matched the description in the patrol alert. (ECF No. 17 at 11-12.) Defendant adds that the officers had no

6

information about Murphy-Robinson in particular that would lead them to detain him. (*Id.*) This is evident from the Vehicle/Pedestrian Investigation Report Officer Wills wrote after the stop, which stated that the officers stopped Murphy-Robinson "because his vehicle matches flash information." (ECF No. 17-2 at 2-3.) Both officers also testified to this at the suppression hearing. (ECF No. 29 at 26:5-11 (Officer Wills stating that they wanted to detain the occupant of the vehicle "[b]ecause the vehicle was wanted in reference to a shooting and it says that the occupants may be armed and dangerous."); *Id*. at 99:4-17 (Officer Bossert acknowledging he had no information about Murphy-Robinson when he detained him.)). Officer Bossert testified that he never observed any suspicious behavior that would suggest to the officers that Murphy-Robinson was engaged in criminal activity at the time he was stopped. (ECF No. 28, 84:2-11.) Defendant argues that because the officers' suspicion was related to the Buick, rather than to the Defendant, they did not possess the reasonable suspicion necessary to seize him.

The government maintains that the presence of the car involved in a shooting three days prior justifies all of the officers' actions. The officers observed the car they believed was used in the December 10, 2023 shooting, and Murphy-Robinson had opened the driver side door to the car and, the officers believed, was preparing to drive away. (ECF No. 21 at 8-9.) The government argues that these facts provided the officers with a clear, reasonable articulable suspicion to stop and detain Murphy-Robinson and preserve the car for evidence. (*Id.*) The government further states that the officers were justified in immediately frisking the Defendant, because the car had been involved in a shooting just days earlier, and a frisk would have immediately revealed the weapon. (*Id.* at 9.) However, the government maintains that the officers did not have the chance to frisk Murphy-Robinson because he resisted arrest and took the taser out of the officer's hand, leading

7

to a further struggle which ultimately caused a loaded magazine to fall from the Defendant's pocket. (*Id.* at 9-10.)

Defendant does not argue that the fact that the officers "were not sure if Mr. Murphy-Robinson was the driver of the car on December 10, 2023" does not mean the officers were required to do nothing when they saw him approach the car. (ECF No. 17 at 14.) However, Defendant argues that the officers should have approached and investigated, rather than approaching and immediately seizing him. (*Id.*) During the hearing, Officer Bossert testified that he initially planned to merely detain Murphy-Robinson; had he complied with the officers' order to stop, Officer Bossert would have "gotten his information, his name, asked him some basic questions in reference to why he was going into the vehicle, what his relation is to the vehicle . . . ." (ECF No. 29, 111:4-19.)

Despite Officer Bossert's statement that he would have taken these actions had the Defendant complied, the Court believes that Murphy-Robinson did in fact comply with Officer Bossert's order to stop, and yet the officer immediately grabbed him, almost contemporaneous with the order to stop, and pushed Murphy-Robinson against the car. Given the presence of the Buick matching the description in the patrol alert, it would have been appropriate for the officers to approach Murphy-Robinson, ask him questions, detain him to inquire about his relationship to the vehicle, and even prevent him from leaving in the vehicle, given the instructions on the patrol alert to "hold guard for prints." (ECF No. 17-1 at 2.) However, Murphy-Robinson was never given an opportunity to answer any questions about himself or his relationship to the car.

Officer Bossert testified that he would have stopped anyone approaching the vehicle and questioned them. (ECF No. 29, 102:4-13.) This indicates that the officers' suspicion was not particularized to the Defendant, as is required to conduct such a forcible detention. *See Fowler*,

8

1995 WL 428693, at *2; *see also Brown,* 159 F.3d at 149 (citing *Terry v. Ohio*, 392 U.S. at 21). Therefore, the Court finds that the officers lacked the reasonable suspicion necessary to seize and forcibly detain Murphy-Robinson in the manner they did. This would be enough for the Court to find that the firearm and the Defendant's on-scene and stationhouse statements are fruit of the poisonous tree and should be suppressed. However, the Court agrees with the government that the inevitable discovery doctrine applies in this case. Hence, the Court's determination of the Defendant's Motion does not stop here.

### B. Inevitable Discovery Doctrine

While the Court has determined that the seizure was unlawful, the Court is persuaded that the inevitable discovery doctrine applies in this case. (ECF No. 21 at 13.) The inevitable discovery exception to the exclusionary rule allows for the admission of unlawfully obtained evidence if the government can prove by a preponderance of the evidence that the evidence would inevitably have been acquired through lawful means. *See United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Nix v. Williams,* 467 U.S. 431, 444 (1984)). The Rule allows courts "to balance the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding against society's interest in deterring unlawful police conduct." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (citing *Nix*, 467 U.S. at 443).

The government argues that the officers had the right to stop the driver of the Buick and question him about the vehicle—a contention that both the Court and the Defendant agree with. (ECF No. 21 at 14; *see also* ECF No. 17 at 14.) The government explains that this investigation would have led to the officers learning the Defendant's name and, subsequently, the fact that there were two warrants issued for him. (ECF No. 21 at 14.) "As part of that inquiry, [the officers] would seek to identify the occupants of the vehicle to further the shooting investigation. As soon as they

9

learned the defendant's real name, they would have searched his name in law enforcement databases and observed that he had two active warrants for his arrest. Once the defendant was arrested on the outstanding warrants, he would have been searched incident to that arrest and the firearm would have been recovered." (*Id.* at 13-14.)

Murphy-Robinson responds that the inevitable discovery doctrine does not apply to this case, because, although there were actions the officers *could have* taken, like getting the Defendant's name and identification, running the vehicle's VIN, and subsequently discovering the warrants, "the officers did not engage in any of these less intrusive procedures because their purpose was to adhere to the SIG unit's directives contained in the patrol alert." (Def. Supp. Br., at 7.) Murphy-Robinson argues that applying the inevitable discovery doctrine would encourage officers to illegally seize anyone in proximity to an object of interest. (*Id.* at 7.)

The Supreme Court has made clear that the inevitable discovery doctrine must focus on "historical facts capable of ready verification," not speculation. *Nix*, 467 U.S. at 444, n.5. The District Court must determine, "viewing affairs as they existed *at the instant before the unlawful search*, what would have happened had the unlawful search never occurred." *Kennedy*, 61 F.3d at 498 (internal citation omitted) (emphasis added). In this case, the officers were acting pursuant to the instructions on the police alert, which told them, "If [the vehicle is] located, contact the Shooting Investigation Group and hold guard for prints. Contact SIG prior to transporting any occupants." (ECF No. 17-1 at 2.)

When the officers pulled their car in front of the Buick, Murphy-Robinson was approaching the Buick, and had opened the door to the vehicle by the time Officer Bossert exited the police vehicle. (ECF No. 29 at 63:17-18.) Thus, it was clear to the officers that Murphy-Robinson was exercising some level of control over the Buick. Had they followed the police alert instructions,

the officers would have, at minimum, prevented Murphy-Robinson from getting into the car and driving it away. During that time, as a part of their inquiry into the vehicle and its owner, it is probable and reasonable to expect that they would have learned his identity and discovered the warrants.

Rather than approach Murphy-Robinson and conduct an investigatory detention based on reasonable suspicion stemming from the police alert and their own observations, training, and experience, the officers immediately seized him, which led to the events that occurred. However, the instructions in the police alert provided the officers with an independent basis to hold the car. Even if the officers had not seized Murphy-Robinson, it is inevitable the officers would have learned his identity and subsequently discovered the warrants, which would have led to his arrest, a lawful search incident to arrest, and the officers discovering the firearm.

Because the Court finds the police alert constituted an independent basis for the officers to detain Defendant, it is therefore inevitable that they would have learned his identity and found the firearm. Thus, the motion to suppress evidence of the firearm is denied pursuant to the inevitable discovery doctrine.

C. **On-Scene and Stationhouse Statements**

Murphy-Robinson has further argued that his statements both on-scene—saying "that isn't my gun" after officers discovered the firearm—as well as his statements the following day at the police station should be suppressed because they are "fruits of the illegal stop and seizure." (ECF No. 17 at 18.) The inevitable discovery rule has traditionally been applied more readily to physical evidence, rather than statements. *See Vasquez De Reyes*, 149 F.3d at 195-96. This limitation, though not a requirement, is logical, because it is nearly impossible to conclude that a Defendant

would have inevitably made a certain statement. Therefore, the Court cannot apply the inevitable discovery doctrine to Murphy-Robinson's on-scene statements, and those are suppressed.

However, the same does not apply to Murphy-Robinson's stationhouse statements. Once the Defendant arrived at the police district, a detective read him his *Miranda* rights and asked if he understood his rights. The Defendant nodded in the affirmative and proceeded to answer the detectives' questions. Defendant argues that the stationhouse statements should be suppressed because there was no "'meaningful intervening event' attenuating the straightforward relationship here between the unlawful action and any inculpatory statements." (ECF No. 17 at 18.) However, because the Court has found that the officers would have inevitably discovered the firearm, it follows that the events at the stationhouse—Murphy-Robinson being mirandized, asked whether he understood his rights, and then questioned—would have naturally followed from his arrest.[5] Therefore, the stationhouse statements Defendant made after the he received his *Miranda* warning and acknowledged he understood his *Miranda* rights shall not be suppressed.

## IV.  CONCLUSION

For the foregoing reasons, Murphy-Robinson's Motion to Suppress is granted in part and denied in part. The Defendant's on-scene statements are suppressed. The firearm and stationhouse statements are not suppressed. An appropriate order follows.

BY THE COURT:

/s/ Hon. Kelley B. Hodge

_____

**HODGE, KELLEY B., J.**

---

[5] Defendant states that "[h]e was not asked if he waived those rights," however, he makes no additional argument that he was improperly Mirandized. The Court will note for the record that it does not identify any deficiency with the procedures that occurred at the police station. *See, e.g.*, *Ahmad v. Redman*, 782 F.2d 409, 413 (3d Cir. 1986) (finding that a Defendant who responded "as salaam alaikum" when asked if he understood his rights after being Mirandized had validly waived his rights.)